MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE, *v.* HATHCOCK.

4-5869 139 S. W. 2d 35

Opinion delivered April 8, 1940.

*Henry Donham,* for appellant.

*Tom W. Campbell, J. H. Lookadoo* and *Pace & Davis,* for appellee.

GRIFFIN SMITH, C. J. Appellee, who was injured November 4, 1937, brought suit under the Federal Employers' Liability Act,[1] asking $60,000. The case was tried August 4, 1939, resulting in verdict and judgment for $30,000.

The following statement is from appellee's brief:

"Henry G. Hathcock was in the employ of Missouri Pacific Railroad Company in the capacity of a brakeman. For ten years he had worked for the railroad company, part of the time as brakeman and the remainder of the time in the yards at North Little Rock as special agent, in the machine shops, and at the elevator, and during all of this time he maintained a perfect record with the Company.

"On the night of November 4, 1937, about ten o'clock, after the freight train upon which he was working as a rear brakeman had stopped in the yards at Newport, Arkansas, he fell from a trestle and was injured so seriously that there was no controversy at the trial about his total incapacity to ever perform labor again.

"This trestle was constructed in the year 1930. Originally it was a solid railroad embankment and at that time about 700 feet of the embankment was removed and the trestle put in to permit the passage of water when White river overflowed. It was a low trestle, being from twelve to fourteen feet high, and when it was floored and covered entirely over with chat like the roadbed, it would be difficult for one walking along the track at night to discover, without making a close inspection for that purpose, that one had left the roadbed and gone upon a trestle.

---

1 Section 51, Title 45, U. S. Code Annotated, reads as follows: "Every common carrier by railroad while engaging in commerce between any of the several states or territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

"The one allegation of negligence relied upon is that the conductor, Guy Maris, when the train stopped at Newport, sent appellee back down the track to flag any train that might approach, and carelessly and negligently failed to warn him of the presence and the condition of a trestle over which he would be compelled to pass in performing his duty and the danger incident to such passage. . . .

"The circumstances under which appellee was injured were as follows:

"During all the time he worked for appellant he lived in North Little Rock. Two years of that time he worked as a brakeman on freight trains. His run as brakeman was south of Little Rock, practically all the time between Little Rock and Texarkana, with an occasional trip to Hot Springs, El Dorado and other places south. Eight years before his injury appellee went north three times on appellant's trains as a special officer and was at Newport, but this was in the year 1929, with one trip early in 1930; but this was before the trestle was put in and the roadbed was a solid embankment at that place at that time.

"On the night of November 4, 1937, appellee was called to go north on a run from North Little Rock to Poplar Bluff, Missouri, as a rear brakeman on a freight train, with Guy Maris as conductor. He was a stranger to the entire crew. He had made only two trips on this run before, each time as head brakeman. He told the conductor that this run was new to him and that he was unacquainted with it and told him he had made only two trips over it in the past seven or eight years.

"When the train arrived at Bald Knob it went in on a sidetrack and appellee and the conductor were on the rear of the caboose, and it being appellee's duty to close the switch, he left the caboose for that purpose at the wrong switch and the conductor called him and showed him the right switch and remarked to him, 'I should have told you before you got off where the switch was because I knew you were not acquainted on this end

of the road.' This conversation was not denied by the conductor and occurred at the last station before they reached Newport. The train arrived at Newport at ten o'clock at night and stopped in the yards for the engine to cut off and get coal and water. The train, as was customary with freight trains, stopped at the Ferry street road crossing. This avoided cutting the train for this crossing and it was the universal custom for trains going north to stop at this crossing and had been for five or six years.

"The train extended back for about a half mile and the caboose stopped from 80 to 100 feet north of the trestle from which appellee fell. Although the conductor knew that the trestle was there and knew that it was a short distance from the caboose and that appellee would be compelled to cross it in obeying his order, and knew that the trestle was unprotected by banisters to safeguard passage over it, and knew that there was no light upon it or about the trestle to reveal its presence, . . . and although he knew it was a dark night, and was raining, and that the only light appellee had to guide him was a brakeman's lantern, and although he knew that the trestle was a ballast deck trestle, being floored, and the floor covered with ballast or crushed rock up to the top of the ties and over the two tracks and between the tracks, and extending out over the side of the trestle in the same manner and exactly like the dump on either side of the trestle, making it impossible for one at night in walking over the track without making an inspection to discover the same to know that the trestle was there, and although the conductor also knew that as the brakeman returned he would go to the right side of the track to signal the engineer, the caboose being so close to the trestle that if appellee followed the universal custom he would give the signal before he left the trestle, although he knew all of these things, the conductor failed to warn appellee of the dangers attendant upon obeying his orders and in carrying out the order so given, appellee fell from the trestle and was injured.

"Appellee did not know that the trestle was there; he had never stopped closer than one-half mile away and there was no fact or circumstance proven in the case that would tend to show that he knew the trestle was there, while the fact that he fell from the trestle forces the conclusion that he was wholly ignorant of its existence.

"For more than thirty years Conductor Maris ran freight trains between Little Rock and Poplar Bluff, and every train going north for the past six or seven years that stopped at Newport stopped at the Ferry street crossing, and the caboose in which Conductor Maris rode stopped near the trestle or on it, depending on the length of the train, these trains stopping there both day and night; also Guy Maris, the conductor, had worked in the yards at Newport and he knew the location of the trestle, its construction, and knew the dangers attendant upon passing over it at night.

"It was admitted that the conductor gave no warning to appellee of the trestle's being there. . . .

"Appellee was further misled and deceived by encountering a trestle in the yards at Newport without banisters upon it to protect employees of the train called upon to use the tracks for their work.

"The proof conclusively showed that where appellee had been accustomed to work as a brakeman in the yards at Little Rock and on his run to Texarkana, and in all of the yards in all of the towns where trains regularly stopped and employees of the trains used the tracks in their work, where there were trestles or bridges, appellant had provided banisters for the safety of its employees on these trestles and bridges.

"It was shown there were four trestles or bridges in the yards in North Little Rock; that three of them had banisters on each side of the trestle or bridge, and one of them about a mile from the depot in the extreme north end of the yards was protected by a banister on the west side of the trestle, one side only being protected because there being a double track on the trestle and outgoing trains did not stop there and incoming trains

that did stop there used the west track and only the west side of the trestle needed protection.

"There were two trestles or bridges in Texarkana, one at Fulton, one at Gurdon, and one at Hot Springs on appellant's line of railroad and at or near each of these trestles or bridges, trains stopped and employees used the tracks in their work over and around these trestles and bridges. At no other town on appellant's railroad south toward Texarkana were there any bridges or trestles. Out in the country where trains were not accustomed to stop and where employees did not use the tracks in their work, there were no banisters on trestles or bridges because none were needed for the safety of employees. . . .

"Appellant in the trial of the case in the lower court attempted to show . . . that the trestle from which appellee fell was not in the yards at Newport and, therefore, it was too remote—not so located that appellant would be called upon to put banisters upon it. The great weight of the testimony was that the trestle was and had been for many years in the yards at Newport and the trains stopped there regularly and that employees of the trains constantly used the tracks at that place for their work. But when it was shown by one of their own witnesses, an engineer, that appellant had put banisters on a trestle two miles farther south toward Little Rock and two miles more remote from the yards at Newport, that ended appellant's contention on that phase of the case.

"Distinguished counsel for appellant at the trial of the case below and in his brief here, laid much stress on Rule No. 99 of the Company.[2]

---

2 "When a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals, a sufficient distance to insure full protection, placing two torpedoes, and when necessary, in addition, displaying lighted fuses. When recalled and safety to the train will permit, he may return. When the conditions require, he will leave the torpedoes and a lighted fuse. The front of the train must be protected in the same way when necessary by the forward trainman or fireman. When a train is moving under circumstances in which it may be overtaken by another train, the flagman must take such action as may be necessary to insure full protection. By night, or by day when the view is obscured, lighted fuses must be thrown off at proper intervals. When day signals cannot be plainly seen, owing to weather and other conditions, night signals must also be used. Conductors and enginemen are responsible for the protection of their trains."

"If the conductor had not been present when the train stopped, and had not decided that it was necessary for the train to be protected and had not sent appellee back to flag and appellee had gone back on his own motion to flag, then a different question would have been presented in this case. But the answer to all of this is that the conductor was present, did decide that the train should be protected and did send appellee back to flag, without warning him of the danger. The conductor always rides in the caboose, has control of the train, receives its running orders and it would be unusual for him not to be there when the train stops and determine whether the train should be flagged and send the rear brakeman out for that purpose, as he did in this case."

### Other Facts—and Opinion.

Counsel have correctly stated that liability of the railroad company is predicated upon the act of the conductor in sending appellee down the track without warning him "of the presence and the condition of a trestle over which he would be compelled to pass."

Appellee testified that when the train arrived at Newport it was composed of 71 cars. The caboose stopped "about a car length and a half north of the north end of the bridge."

"Q. If the train stopped at the Ferry street crossing, you were down in the yards from the Ferry street crossing how far? A. About three quarters of a mile. . . . The conductor told me to go back and flag—he was going to the head end. I carried a red light, white light, electric lantern, torpedoes and fusees. . . . I would judge I went back about a quarter of a mile. There were two tracks—one used for trains going north and the other for trains going south. I got off the caboose on the left side, between the tracks. It is about eight feet between the two main lines. I went all the way where I was going between the two lines, and remained there until I was called in by the engineer by four blasts of the whistle.

"In going back I knew—or thought I knew—there was a slight curve in the track. I didn't know just where it was, and I didn't know where the engine cut off, and I didn't know where the length of the train we had would reach. I stepped over to the right of the northbound main [line], both rails, for the purpose of seeing if I could see the conductor or brakeman's lantern and signal them that I was ready to go. When I stepped over there, thinking I was on a dump and [was] going to step off on the ground—I had been looking toward the head end, and when I got out far enough in order to successfully pass the signal to them—when I did look back, down right in front of me where I was going, it was too late to stop, and I fell off the side of the bridge. . . . I was about two or two and a half car lengths from the caboose when the accident occurred. A car is forty feet long. I was around 80 to 100 feet from the caboose when I went out there for the purpose of getting the signal to the right hand side of the train."

It is not necessary to discuss the law of assumed risk or contributory negligence. The act of Conductor Maris is not controlling. It is conceded that appellee was sent back for the purpose detailed in the statement of facts. The question is, Was he sent into a place of peril?

Appellee was an experienced trainman. On cross-examination he admitted he was "possibly not cautious" when he stepped into a place the condition of which he could not see. There were steel guards less than rail-high extending across the trestle. When asked whether he knew there was a trestle "back toward the river between the place where you stopped and the river bridge," appellee replied, "I thought I remembered one."

"Q. You told the court reporter when he took your statement that you thought you knew there was a trestle back there? A. I thought there was one back there—I thought it at the time. But it was so dark I couldn't see

it. I didn't look for it: I had no idea I was back as far as the trestle.'' [3]

Photographs of the trestle and testimony of witnesses are conclusive of the proposition that there were no structural defects. Appellee was provided with lanterns—one reflecting red for signal purposes, the other of the type approved for lighting. Appellee's explanation is that he thought he was on a dump, and dumps are built so that one stepping off the railroad will not fall into space. But this assumption was appellee's error of judgment. Ordinary prudence suggests that one engaged at night on unfamiliar premises should use the means at hand for observing his course when departing from a zone of safety. The fact that appellee, on his trip to place the signals, walked the distance of the trestle, and had traversed most of its length in returning before he turned aside, is conclusive evidence that the trestle, *per se,* did not cause the injury.

A United States Supreme Court decision appealed from Missouri *(Baltimore & Ohio R. R. Co.* v. *Berry)*[4] cited by appellant is in point. Berry was one of a crew of five. He served as rear brakeman and rode in the caboose with the conductor. The train was stopped on the main line on account of a hot box. Berry testified that the conductor directed him to ''get out and go ahead and find the hot box.'' Berry took his lantern, walked down the caboose steps and fell into a ravine which was spanned by a trestle on which the train had stopped.

The Supreme Court of Missouri held that under instructions of the trial court the jury, in order to return

---

3 In his application for employment made after his student runs as brakeman, the following written representation was made: "That I am fully informed as to the hazardous nature of the duties of a railroad brakeman and am aware of the presence on the company's properties and on the properties of other railroad companies where my duties may take me, of bridges, buildings, tunnels, viaducts, stockyard chutes, platforms, coal chutes, and other obstructions and exposures, and that few, if any, of said obstructions will clear a man riding on the outside of locomotives and cars; that to avoid injury to myself and others I must use constant care; that I will familiarize myself with the company's current time card rules and regulations and be governed thereby; and that I hereby assume all of the risks, hazards, and exposures incident to my employment in the above capacity and any other capacity in which I may be employed by the company from time to time." [It should be stated that appellee testified, or it was testified in his behalf, that the trips he had made over the division were before the trestle was put in].

4 286 U. S. 272, 278, 52 S. Ct. 510, 76 L. Ed. 1098.

a verdict for Berry, was required to find that the rail-road company was negligent in stopping the caboose on the trestle and in directing or permitting Berry to leave it. It was held that there was no evidence that the railroad company was negligent in stopping the train, but there was negligence in directing Berry to go forward. In holding there was no liability the Supreme Court of the United States said:

"There was no evidence that either the conductor or respondent (Berry) knew that the caboose had stopped on the trestle as they were together in the cupola of the caboose when the train stopped. Their opportunity for knowledge as each knew was the same. Hence there is no room for inference that the conductor was under a duty to warn of danger known to him and not to the respondent, or that respondent relied or had reason to rely on the conductor to give such warning, nor was the request to alight a command to do so regardless of any danger reasonably discoverable to respondent. The conductor did not ask respondent to alight from the caboose rather than from one end of the forward cars standing clear of the trestle, where it was safe, or to omit the precautions which a reasonable man would take to ascertain, by inspection, whether he could safely alight at that point chosen. There was no evidence that the respondent could not have discovered the danger by use of his lantern or by other reasonable precautions, or that he in fact made any effort to ascertain whether the place was one where he could safely alight.

"The state Supreme Court thought that it was the duty of the conductor to ascertain, by inspection, whether respondent could alight with safety, and to give warning of the danger if he could not. But there was no evidence of any rule or practice, nor do we know of any, from which such a duty could be inferred. The conductor could have no knowledge of such danger, nor was he in a position to gain knowledge, superior to that of other trainmen, whose duty it was to use reasonable care to ascertain, each for himself, whether, in doing his work,

he was exposing himself to peril. A duty which would require the conductor, whenever the train was stopped and trainmen were required to alight, to inspect the place and warn of danger where each might get off the train, would be impossible of performance.

"There was no breach of duty on the part of the conductor in asking the respondent, in the performance of his duty, to alight or in failing to inspect the place where he alighted or to warn him of the danger. If negligence caused the injury, it was exclusively that of the respondent. Proof of negligence by the railroad was prerequisite to recovery under the Federal Employers' Liability Act."

Railroad companies are not as a matter of law required to maintain banisters on trestles. The fact that in some instances this extraordinary care is exercised does not establish by implication a custom upon which employees may rely to the extent that they are relieved of the obligation due themselves to observe physical conditions where the means of so doing are provided.

On the plaintiff's testimony there should have been an instructed verdict for the defendant.

The judgment is reversed, and the cause dismissed.

Mr. Justice HUMPHREYS and Mr. Justice MEHAFFY dissent.